HENRY B. WILLIAMS *vs.* BOSTON WATER POWER COMPANY.

Suffolk. Jan. 26. — March 3, 1883. FIELD & W. ALLEN, JJ., absent.

A deed described a parcel of land in a city as bounded and described according to a certain plan, and gave the metes and bounds, the front line being on a street named, one of the side lines being on a street described as a street forty feet wide, and the rear line being on land of a railroad corporation. The plan showed that part of the rear line was a curved line; that on the other side of the street forty feet wide was a lot of land with a frontage of two hundred and sixty feet; that in front of this lot was an open triangular space formed by the street in front of the lot and another street approaching at an acute angle, the side lines of the streets next to this space not being shown. These streets and the open space were owned by the grantor. The streets and the land were then only in part filled and graded. *Held*, that the grantee did not have the right to have the triangular piece kept open.

BILL IN EQUITY, filed December 6, 1880, by the owner of a lot of land in Boston, marked B on the plan printed in the

margin,* against the owner of the triangular lot of land enclosed in dotted lines, and marked A, on the same plan, for a*r* injunction to restrain the defendant from ever building on s*u t* lot, and for further relief.　The bill contained the following allegations :

1. By deed dated June 20, 1866, and duly recorded on June 28, 1866, with Suffolk deeds, libro 881, folio 96, the defendant conveyed, with all the privileges and appurtenances thereto belonging, to Nathan Matthews, a certain parcel of land, described in said deed as follows : " A certain piece or parcel of land

situated in that part of the city of Boston called the Back Bay, bounded and described, according to a plan recorded herewith, as follows, viz.: beginning at a point on the southerly side of St. James Street one hundred feet westerly from Clarendon Street, and running southerly on land of M. D. Ross, three hundred and seventy-eight $\frac{77}{100}$ feet, to land of the Boston & Providence Railroad; thence turning and running southwesterly on land of said railroad, and on land of Boston & Worcester and Boston & Providence Railroads, four hundred and seventy-three $\frac{53}{100}$ feet, to Dartmouth Street; thence turning and running northerly on said Dartmouth Street one hundred and eighteen $\frac{70}{100}$ feet, to a street forty feet wide; thence turning and running easterly on said street forty feet wide three hundred feet; thence turning and running northerly three hundred and ninety feet, to St. James Street, on a street forty feet wide; thence turning and running easterly on said St. James Street one hundred and forty-eight feet, to the point of beginning."

2. By deed dated April 9, 1868, and duly recorded on April 15, 1868, Matthews conveyed to Lyman Nichols the northerly portion of said land, being that marked B on the plan printed in the margin of the preceding page, and described in said deed as follows: " A certain piece or parcel of land, situated in that part of the city of Boston called the Back Bay, bounded and described according to a plan recorded with deed from Boston Water Power Company to me, dated June 20, 1866, with Suffolk deeds, lib. 881, fol. 96, as follows, viz.: "Beginning at a point on the southerly side of St. James Street, one hundred feet westerly from Clarendon Street, and running southerly on land now or late of M. D. Ross, one hundred and fifty feet, to land of Peter T. Homer; thence turning and running westerly on land of said Homer, one hundred and forty-eight feet, to a street forty feet wide; thence turning and running northerly on said street forty feet wide, one hundred and fifty feet, to St. James Street; thence turning and running easterly on said St. James Street, one hundred and forty-eight feet, to the point of beginning; and contains twenty-two thousand two hundred square feet."

3. By deed dated March 1, 1880, and duly recorded on the same day, the executors of, and trustees under, the will of

Nichols conveyed the premises last described to the plaintiff, the description thereof being the same as in said deed to Nichols; and the plaintiff is now the owner of said land.

4. At the time of the conveyance to Matthews all the land represented on said plan as lying north of the lot designated as a "Proposed site for the Institute of Fine Arts," and between said site and Huntington Avenue, together with and including St. James Street, the forty-foot street and Huntington Avenue, was owned by the defendant.

5. It appears on the face of the plan annexed to said deed of the defendant to Matthews, that all the land lying northwest of the plaintiff's lot is an open square, highway or place of some kind, which square, highway or place is either a part of Huntington Avenue, or is an open square bounding the lot of the plaintiff and connecting it with Huntington Avenue; so that, by virtue of said conveyance of the defendant to Matthews, there is attached to the plaintiff's lot the right of access to and from the same, over the open square, highway or place of some kind described above, and the right to have the same kept open as an open square, highway or place of some kind, so that there may be from the plaintiff's lot an unobstructed view over, and light and air from, the same, and all other benefits thereof.

6. In pursuance of its duty in the premises, and to carry out and effectuate said easement and rights, the defendant conveyed to the city of Boston, for public highways and other public uses, in the years 1875 and 1876, by deeds duly recorded, all the land referred to in the preceding paragraph except a triangular parcel lying in the midst thereof, as follows: 1. A small parcel of land curved in shape, adjoining said Institute site on the north, for the purposes declared in its previous deed to the city of the Institute site, and to form a part of the open ground in front of the building to be erected thereon. 2. A strip of land fifty feet wide, lying directly in front of said Institute site, as added to as aforesaid, and running east and west, for a continuation of St. James Street, and the same is now called St. James Avenue. 3. A strip of land forty feet wide and one hundred feet long, running north and south, lying directly west of a lot which lies north of the land of the plaintiff, and is separated from it by St. James Street, for a continuation of said forty-foot street,

and the same is now called Trinity Place.   4. A strip of land
one hundred feet wide, embracing the enclosed space marked
on said plan as "Huntington Avenue," and running from Dart-
mouth Street in a northeasterly direction, for a continuation of
said Huntington Avenue, and the same is now so called.   All
of these grants have been duly accepted by said city; but the
remainder of the open land lying north of the Institute site,
being a parcel triangular in shape, and enclosed by the afore-
said portions of St. James Avenue, Huntington Avenue and
Trinity Place, is still owned by the defendant, and is still vacant
land.

7. The plaintiff has erected upon his land, at great expense,
six dwelling-houses of a very superior class, facing to the north,
and the said houses and especially the most westerly of them,
situate on the corner of St. James Avenue and the forty-foot
street, command an unobstructed view over St. James Street
and Trinity Place, and the intervening triangular piece of land
aforesaid, to Huntington Avenue, and have a direct access to
the same.

8. The defendant is beginning to build upon the said triangu-
lar piece of land dwelling-houses of the usual height, whereby
the light and air coming to the plaintiff's said houses will be
greatly diminished, the prospect from the same cut off, the ac-
cess of the same to Huntington Avenue directly obstructed, and
the value of the same greatly impaired.

The answer admitted the first four allegations of the bill;
denied that by the deed to Matthews, who was then president of
the defendant corporation, it conveyed to him any right or inter-
est in, to or over said triangular parcel of land; that by the
deed to Matthews and the plan recorded therewith, or in any
other way, it ever agreed with Matthews, or any one, that said
triangular piece of land should be kept open, or that Matthews
or his assigns should have any rights to, in or over the same.

The answer also alleged that, before the plaintiff purchased
of the executors of Nichols, Huntington Avenue, St. James Ave-
nue and Trinity Place were constructed as streets of the usual
grade of streets on the Back Bay; that, when the streets were
filled, said triangular piece was filled to a less grade, namely to
the usual grade of land on the Back Bay intended for building

purposes; that the defendant made to the city of Boston convey-
ances of the streets as alleged, but not in performance of any
duty, or to carry out and effectuate any easements or rights of
the plaintiff or·his grantors; and that the defendant was about
to erect a building on the triangular piece of land.

The case was referred to a master, to report all the facts
bearing on the issue, which either party desired. The master
reported the following facts:

The deed dated June 20, 1866, from the Boston Water Power
Company to Matthews, was delivered and recorded on June
28, 1866, and no plan was ever annexed to the original deed.
On or about June 22, 1866, the Boston Water Power Com-
pany employed one Fuller, a civil engineer, to make a plan of
the premises, and on that day, and on the twenty-third and
twenty-seventh days of the same month, Fuller made calcula-
tions of area and did other work upon such plan. Fuller com-
pleted the plan on July 5, 1866, and on or after that day the
plan was left at the Suffolk registry of deeds for record. This
plan is now pasted in volume 881, folio 96, at the registry of
deeds, on a page containing the record of the aforesaid deed, and
there is written on the plan, in the handwriting of Andrew
Cazneau, who in 1866, and before and after, was office clerk at
said registry, the following letters and figures: "Lib. 881, fol.
96." This plan was in course of preparation, and was the one
contemplated and anticipated by the parties to said deed when
they used the language therein, "according to a plan recorded
herewith," and at the time of the execution and delivery of said
deed.* Instances are not uncommon in the Suffolk registry of
deeds where parties leaving deeds for record announce to the
register that plans which are to be recorded therewith have been
forgotten or are not quite ready, and such plans are brought
in and' left for record subsequently to the leaving for record
of the deeds. No evidence was adduced as to whether the
parts of the plan which show more land than that described

* Annexed to the master's report was a copy of the plan referred to.
The plan printed in the margin of page 407 is a copy of it, with the addi-
tion of the letters A and B, the dotted lines enclosing the triangular space,
and the dotted line below the letter B, which shows the southerly boundary
of the plaintiff's land.

in the deed were agreed to, or known to either party to the conveyance.

In June 1866, the land conveyed to Matthews and now held by the plaintiff was substantially all graded. The proposed site for the Institute of Fine Arts, and the land to the north of it, were partially graded only. Of the streets in the neighborhood, Huntington Avenue, as now located, had, in June 1866, been determined on, to be one hundred feet wide, but had not then been graded at all. Boylston Street (which runs east and west, and lies immediately north of the land shown on the plan) had then been graded and constructed to a point about eighty feet westerly of Dartmouth Street. A passageway, about twenty-five feet wide, parallel with and northerly of St. James Avenue, had been graded to a point westerly of the said triangular piece of land: this passageway ran through the lot north of St. James Street and east of the triangular piece of land, is now owned by Trinity Church, and has been discontinued; its southerly line, which was about twelve feet north of the northerly angle of said triangular piece of land, was the dividing line between the land then owned by the Commonwealth and that owned by the defendant. St. James Avenue, fifty feet wide, in June 1866 had been graded to a point from one hundred and fifty to two hundred feet westerly of Clarendon Street, (which lies easterly of the land shown on the plan, and is parallel to Dartmouth Street,) and said grading overlapped about seventy-five feet the land now owned by the plaintiff. The streets about the lot of the Institute of Fine Arts had not been graded. The triangular lot of land, together with the surrounding streets, was graded by the defendant in the latter part of 1866; said piece was in part graded by the grading of the streets surrounding it, but other filling was done thereon besides that done upon the streets. In March 1869, this triangular piece, Huntington Avenue and St. James Avenue had been graded to substantially the same level, but by whom and at whose expense did not appear, nor did it appear how long this state of things had existed.

No claim against the defendant of any right in said triangular piece was ever made by Matthews or by Nichols; nor was any right therein mentioned in the negotiations between the defendant and Matthews when he purchased his lot. At that time

Matthews was president of the defendant corporation, and continued to be its president until May 1869. Nichols became a trustee under an indenture of mortgage executed by the defendant in February 1874, and so continued till his death in 1879, and during said period was in the office of the defendant corporation two or three times a week, and had frequent consultations with its officers. In June 1866, at the time of the conveyance to him, Matthews knew that the streets herein mentioned had been decided on as they now exist, both as to width and location; and, as president of the defendant company, he afterwards included the said triangular piece in the assets and valuation of the company, and said company has paid taxes and betterment assessments thereon. Several years prior to the time when the plaintiff purchased his lot of land, the triangular piece was fenced by the defendant, and, at the time of his purchase, the plaintiff knew that the triangular piece of land was enclosed by a fence; he supposed it was always to be kept open, but knew that this was disputed. The angles of the triangular piece have been rounded off by the city, and it paid for the land so taken.

The case was heard by *C. Allen*, J., on the pleadings and the master's report, and reserved for the consideration of the full court, such decree to be entered as justice might require.

*J. C. Ropes & J. C. Gray*, for the plaintiff. 1. Where a deed refers to a plan, the plan must be considered as making a part of the contract, so far as is necessary to aid in the description of the rights intended to be conveyed. "All the particulars appearing on the plan and applicable" to the lot conveyed "are to be regarded as if they had been fully set forth in the deed." *Boston Water Power Co.* v. *Boston*, 127 Mass. 374, 376. In the case at bar the plan represents St. James Avenue or Huntington Avenue as expanding into a square at the northwest corner of the plaintiff's lot. This is a "particular" "appearing on the plan," and "applicable" to the lot conveyed, — in fact of the greatest consequence to it. The case is governed by *Farnsworth* v. *Taylor*, 9 Gray, 162.

2. The master found that, at the time of the conveyance to Matthews, all the ways represented on the plan as surrounding the lot conveyed were owned by the defendant, and that on the

north and west of the lot these ways had not been constructed. This disposes of the suggestion that the plan was made only for a convenient description of the curved line on the southerly boundary, and compels to the conclusion that for his rights of way on the north and west of his lot the plaintiff must have recourse to the plan; and the plan shows an uninterrupted access from the northwest corner of the lot to Huntington Avenue. That some right of access to Huntington Avenue is granted to the plaintiff by the plan is not denied; that the extent of the plaintiff's rights is determined by the plan, and cannot be restricted by the defendant, is well settled. *Fox* v. *Union Sugar Refinery*, 109 Mass. 292. *Thomas* v. *Poole*, 7 Gray, 83. *Rodgers* v. *Parker*, 9 Gray, 445.

3. The plaintiff's case differs from that of Brown, in 127 Mass. 374, in this, that the rights of way on the northwest of his lot, which the plaintiff insists can be gathered only from the plan, are absolutely necessary to the use and enjoyment of his lot.

4. The fact that the plan was not completed till after the deed was recorded is of no consequence. The only question is this: Was the plan the plan of the defendant? If it was the plan of the defendant, it is wholly immaterial whether it was or was not finished when the deed was recorded. See *Hedge* v. *Drew*, 12 Pick. 141; *Blaney* v. *Rice*, 20 Pick. 62; *Valentine* v. *Wheeler*, 116 Mass. 478.

*D. Foster*, for the defendant.

HOLMES, J. This is a second attempt to assert an easement over a small piece of land, which was before the court in *Boston Water Power Co.* v. *Boston*, 127 Mass. 374. The land in question is a triangular piece lying in the acute angle between Huntington Avenue and St. James Avenue (formerly St. James Street) where they meet, on the territory recently reclaimed from the Back Bay in Boston. It is bounded on the other side (easterly) by a forty-foot way, now called Trinity Place. The present plaintiff owns an estate to the southeast of the triangle, and separated from it by the intersection of St. James Avenue and Trinity Place, which cross each other at right angles. He derives his title through a deed from the defendant to Matthews conveying a large tract, of which the plaintiff's

estate is a portion. The material part of this deed was in these words : " bounded and described, according to a plan recorded herewith, as follows, viz. : . . . . thence turning and running northerly, three hundred and ninety feet, to St. James Street, on a street forty feet wide [now Trinity Place] ; thence turning and running easterly on said St. James Street, one hundred and forty-eight feet." The plan referred to, like that in the former case, shows the street lines opposite the triangle in question, but does not enclose the triangle, and the plaintiff founds his claim upon this fact. Perhaps it should be added, that the plan has some marks of completeness to the westward of the triangle, on the farther side of it from the Matthews tract, which is an argument, as far as it goes, that leaving the nearer space unenclosed amounted to a declaration that it was to remain open. But we are of opinion, upon inspection of the plan and the construction of the deed, that no such right was attached to the land conveyed to Matthews.

The lines on the opposite sides of the ways enclosing the triangle cannot be taken to mean that all within them shall be open. They are side lines of streets, and extend in the same directions as far as the streets are shown on the plan. They are put down irrespective of their accidental relation to each other by reason of which they enclose a parcel of land. They mean no more in this place than at any other point in their course. They cannot be dealt with like a triangle drawn as such, and are wholly unlike two lines obviously drawn in relation to each other for the purpose of indicating a street between, as in *Farnsworth* v. *Taylor*, 9 Gray, 162. In this case the omission of any one of the three lines would not affect the propriety of inserting the others. It is true that there are no inner street lines enclosing the triangle ; that the plan shows, by the street names and otherwise, that some land around the triangle was intended to be open ; and that there is nothing except the equal width of the streets elsewhere to show where, if anywhere, the lines were to be drawn. But the absence of lines, if under any circumstances it could be sufficient to establish an easement in cases like the present, in this instance rather suggests uncertainty as to the details of the ultimate laying out of the land, and did not sufficiently and clearly say to Matthews, This space

is forever to remain vacant. If the plan had only shown the side lines of the forty-foot street and of St. James Street, obviously no inference could be drawn that an indefinite space was to be kept open. The line of Huntington Avenue does not change the case, because it is not inserted with that intent. Its primary object is to mark the course of the avenue, and it does not necessarily import any other purpose. If the enclosed space had been con-siderable, the question would hardly have been raised. The fact that it is small makes no difference in the legal effect of the plan. In short, while it is undoubtedly true that the plan did not show any affirmative intention to enclose or build upon the triangle in question, we think that it is also true that the plan failed to assert a contrary intention so definitely as to give Matthews an easement.

Our opinion is confirmed by the words of the deed, and the circumstances at the time it was executed. The precise form of reference to the plan is to be noticed. It is "bounded and described, according to a plan," &c. These words are satisfied if the reference to the plan be taken to have been for purposes of boundary and description. As was pointed out by the de-fendant's counsel, the curved boundary to the south could not have been described otherwise so easily as by delineation. Plans are constantly used for this purpose, and there is no presumption that a reference to one enlarges or adds to the easements other-wise conveyed. In *Farnsworth* v. *Taylor, ubi supra,* the plan was referred to for the street in controversy.

The deed gave Matthews a forty-foot way on one side of his tract next the triangle, and St. James Street on the other. This was fifty feet wide as far as laid out, and was intended to be of that width until it reached the forty-foot street. Without inquir-ing too nicely as to the limit of the easements created by the words alone, it is clear that, applied to the land, as they might have been perfectly well, without the plan, the words would not have given Matthews what the plaintiff claims. Yet they deal with the subject matter. It is somewhat harder to enlarge their scope, or to add to them by reference, than it would be to import an easement where the deed was silent.

The tract conveyed to Matthews, after stretching three hun-dred and ninety feet to the south from St. James Street, turned

at right angles, and extended westerly three hundred feet, to Dartmouth Street, in the rear of the proposed site of the Museum of Fine Arts, which lay between that portion of the Matthews parcel and the triangle. If the plaintiff's argument be correct, the easement was annexed to the whole of this estate, although useless to the greater part of it. The plaintiff makes no attempt to introduce any principle of apportionment on the ground that the parcel was manifestly destined to be cut up into building lots.

Passing now to circumstances outside of the deed and plan, Matthews was the president of the defendant corporation. Just north of the triangle, almost touching it and parallel to St. James Street, was the line of division between the defendant's lands and those of the Commonwealth; so that while it was known to have been determined that Huntington Avenue should be one hundred feet wide, so far as appears, it was open to the State to change its plans with regard to the portion directly to the north, and thus to necessitate some corresponding changes on the part of the Water Power Company. Again, so far as appears, the land to the south was only the "proposed" site for the Institute of Fine Arts; and here again changes were possible. Most of the land in question had not been graded, and some of it was still under water. These facts explain a certain degree of vagueness in the plan, and are against its being interpreted as creating an easement by implication.

Taking the circumstances, the mention of the ways in the deed, the form of reference to the plan, and the plan itself, as it appears on inspection, into account, we have no doubt with regard to our conclusion.

We have considered the case apart from another fact, which would of itself be a serious obstacle in the way of the plaintiff's recovery. The deed was recorded on June 28, 1866. The plan, instead of being recorded with it, was not even completed until July 5. Without otherwise insisting on this fact, we think that it lends additional confirmation to the construction which we have adopted. If the plan had been referred to in terms as one to be completed thereafter, it would hardly be contended that it was to be construed as enlarging or adding to the easements granted by the words of the deed. The difficulties are equally

great in giving such a construction to a plan which was in fact not yet completed.

As Matthews got no title legal or equitable to the alleged easement, the plaintiff could take none.    *Bill dismissed.*